# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

NICHOLAS DAYTON, individually,
and "M.D." a minor, individually,

        Plaintiffs,

    vs.

SCHOOL BOARD OF BREVARD
COUNTY, FLORIDA; a political
subdivision of the State of Florida;
CARRIE HUMPHRYS, individually;
and JOHN DOE 1-10, individually,

        Defendants.

**Case No.: 6:25-cv-2183**

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, NICHOLAS DAYTON and M.D., sue Defendants, the SCHOOL BOARD OF BREVARD COUNTY, FLORIDA ("the School Board"), CARRIE HUMPHRYS, and JOHN DOE 1-10, and alleges as follows:

## PRELIMINARY STATEMENT

1.     Brevard Public Schools' website states that their motto is "to serve every student with excellence as the standard," yet the School Board has fallen woefully short on their own motto.

2.     Simply put, Defendants, *inter alia*, authorized at least three illegal strip searches of M.D., a minor, on Brevard School Board grounds in direct violation of the Fourth Amendment for unreasonable searches and seizures. In addition, the School Board has a custom of ignoring student complaints and falsifying or under reporting bullying and violence in Brevard Public Schools.

3.     When parents, like Dayton, challenge the School Board, then they retaliate with calculated defamation without a shred of evidence.

4.     M.D. was forced to enroll in another school due to the School Board's inaction to protect a minor of ongoing harassment from students—and staff.

## NATURE OF THE ACTION

5.     This is a federal civil rights action for damages, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, enforced through the Civil Rights Act, 42 U.S.C. §§ 1983, 1988, to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

6.     This is also a state law action for negligence, defamation, and intentional infliction of emotional distress.

## PARTIES

7.     Plaintiff, NICHOLAS DAYTON ("Dayton"), is *sui juris* and is a citizen of the State of Florida.

8.     Plaintiff, M.D., is a fourteen-year-old minor, who is a citizen of the State of Florida.  Dayton is M.D.'s legally adopted father.

9.     Defendant, the SCHOOL BOARD OF BREVARD COUNTY, FLORIDA, is a political subdivision of the State of Florida.  The School Board is the public school district covering all public K-12 schools in Brevard County, Florida, including Eau Gallie High School, in Melbourne, Florida.  The School Board is sued in its official capacity.   Eau Gallie High School does not operate entirely independently — it is an element of the public-school district's system, not a private

or charter school independent of the district. The School Board oversees Eau Gallie High School's policies and procedures, staffing (i.e., teachers, administrators), curriculum aligned with state law, student discipline policies, and facilities management.

10. Defendant, CARRIE HUMPHRYS ("Humphrys"), is *sui juris* and is citizen of the State of Florida. Humphrys is the Assistant Principal of Eau Gallie High School, and she had direct involvement with the illegal strip searches of M.D.

11. JAMES REHMER ("Rehmer") is the Assistant Superintendent, Chief of Schools, of Brevard Public Schools. He had direct involvement with the illegal strip searches when he was notified about the searches, but then did nothing to stop them.

12. KEITH BARTON ("Barton"), is the Principal of Eau Gallie High School, and he had direct involvement with the illegal strip searches when he was notified about the searches, but then did nothing to stop them.

13. Under belief, Defendant(s), JOHN DOE 1-10 ("Doe"), are *sui juris* and they are citizens of the State of Florida. Doe had direct involvement with false accusations and false reporting to the Florida Department of Children and Families ("DCF"), alleging that M.D. was molested and got pregnant by Dayton. As to this date, Defendants have refused to reveal Doe's identities, which will be demanded in discovery. As a result, this pleading will be amended.

## SUBJECT MATTER JURISDICTION

14.    This Court has jurisdiction over the subject matter in this action, pursuant to 28 U.S.C. §§ 1331, 1343, because this action involves federal questions raised by the Civil Rights Act, 42 U.S.C. §§ 1983, 1988, *et seq*.

15.    Aside from the federal claims alleged herein, this Court has supplemental jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. § 1367, because the Court has original jurisdiction of the federal question claims, and the state law claims are so related to the federal question claims that they form part of the same controversy under Article III of the United States Constitution.

## PERSONAL JURISDICTION

16.    This Court has general *in personam* jurisdiction over Defendants because they are found in the State of Florida.

## VENUE

17.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(1), because all Defendants reside in the State of Florida and in the bounds of the Middle District of Florida.

18.    As an independent and alternative basis, venue is also proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims accrued in Brevard County, Florida; more specifically, the claims accrued around 1400 Commodore Blvd., Melbourne, Florida 32935.

19.    The Orlando Division of this Court is proper, pursuant to Local Rule 1.04(a), because the claims accrued in Brevard County, Florida.

## GENERAL ALLEGATIONS

20.    M.D. is adopted and moved to Melbourne, Florida in or about February 2023.

21.    M.D. entered middle school at L.B. Johnson Middle School in Melbourne, Florida.

22.    M.D. is an honor's student, consistently earning upwards of a 3.8 GPA.

23.    For approximately 157 days, from August 2023 until January 2024, a male student called M.D., multiple female students, and children of color misogynistic and racial slurs on an almost daily basis.

24.    The school did nothing to correct the male student's behavior.

25.    M.D.'s emotional state started to deteriorate on the ongoing misogynistic and racial slurs that she endured, daily.  As a result, M.D. started therapy.

26.    Despite ongoing complaints by L.B. Johnson Middle School students of color, the school ignored the complaints.

27.    True and correct copies of some of the complaints are attached hereto as **Exhibit A**.

28.    Multiple students continuously reported the slurs to school teachers and school staff for months, to no avail.  School Board protocol was not followed, no

action was taken that protected the students from this occurrence, and the students of color continued to be called racial and misogynistic slurs, including M.D.

29.    In some cases, the students were admonished by teachers for simply verbally reporting the incidents.

30.    On November 15, 2023, Dayton filed an Incident Report with the Assistant Principal on the lack of action to protect M.D. and other students of color.

31.    The school refused to interview the majority of the victims that wanted to make a statement.

32.    The school refused to notify any of the parents of the students that had been abused as required by School Board policy regardless of the outcome of the investigation.

33.    Separably, the school refused to offer counseling to the students as required by School Board policy regardless of the outcome of the investigation.

34.    As a result, in or about March 2024, the Daytons filed a complaint with the United States Department of Education against Brevard County Schools for the ongoing lack of action to protect students of color and for falsifying documents regarding state and federal violence and bullying reports including the School Environmental Safety Incident Report (the "SESIR"), falsely reporting numbers of "zero" as far back as 2019.

35.    From that time, the School Board labeled the Daytons as "whistleblowers" and started to retaliate against the Daytons.

36.    The School Board started to stonewall Dayton's records requests.

37.    In August 2024, M.D. went to high school at Eau Gallie High School, wherein she continued to be harassed for unknown reasons by students and staff.

38.    M.D. continued to be an honor's student at the school.

39.    However, several teachers changed M.D.'s grades to lower grades and refused to correct them until Dayton produced records confirming M.D. did the work.  This happened at least seven times wherein M.D.'s grades were constantly changed to lower grades (or to zero) until the Daytons had to prove each and every assignment to the teachers.

40.    M.D. continued to be bullied and harassed by students.

41.    On September 4, 2024, one of M.D.'s teachers made a disparaging comment about Dayton for unknown reasons.

42.    On September 11, 2024, one of M.D.'s teachers sent M.D. to the Principal's Office "to be disciplined."  M.D. called Dayton.  She returned back to class without any explanation from the school as to why she was summoned to the Principal's Office in the first instance.

### *False Accusations of Molestation*

43.    On or about September 18, 2024, school official(s) at Eau Gallie High School called DCF and stated that M.D. was pregnant and was molested by Dayton.

44.    DCF then opened an investigation into Dayton.

45.    On September 18, 2024, a police officer came to the Dayton's residence around 10:30pm.  The officer questioned Dayton about M.D., stating that the police

received a report that M.D. was pregnant. The officer refused to state the name(s) of the complainant. The officer questioned M.D. and then left.

46.    To document the false reporting, the Daytons and M.D. went to their pediatrician, who confirmed that M.D. has never been pregnant.

47.    On September 19, 2024, police officers started to "stake out" the Dayton's home with DCF Agent Joseph Kazoroski. Police officers and Agent Kazoroski approached Dayton in his driveway. In the course of the discussion, Dayton gave Agent Kazoroski a copy of M.D.'s pediatrician report confirming that M.D. has never been pregnant.

48.    The police officers and Agent Kazoroski spoke with M.D. directly, alone, who confirmed that she has never been molested from anyone.

49.    On September 19, 2024, school staff begin to conduct interviews with students and other unknown people, publicly informing them of the allegations towards Dayton and M.D.'s alleged pregnancy and molestation. Many of those people who were interviewed were unaware of any allegations.

50.    The pregnancy and molestation allegation quickly spread like wildfire on both on and off campus, with the aftermath of ongoing humiliation for both Dayton and M.D.

51.    Staff at Eau Gallie High School published the pregnancy and molestation allegation without any evidence. Eau Gallie High School has not been forthcoming as to the identification of the complainant(s), which will be demanded

in discovery with an amended pleading, substituting from "Doe 1-10" to the actual staff members who intentionally defamed Dayton.

52.    On September 19, 2024, the Daytons sent an email notice to DCF management notifying DCF of the retaliatory accusation and requirement for a comprehensive investigation of the false reporting.

53.    A true and correct copy of the email sent to DCF is attached hereto as **Exhibit B**.

54.    On September 19, 2024, M.D. began to experience ridicule and bullying about the false pregnancy and molestation allegations on the Eau Gallie High School campus from students.

55.    On September 22, 2024, the Daytons filed a complaint regarding the false DCF report.

56.    A true and correct copy of the complaint is attached hereto as **Exhibit C**.

57.    The type of investigation filed requires an investigation within 15 days. However, the School Board violated its own policy by refusing to conduct the investigation on the false reporting.

58.    By refusing to investigate the false pregnancy and molestation allegations, the School Board has exhausted any possible administrative remedies.

### *The Three Illegal Strip Searches*

59.    On September 30, 2024, M.D. was in class when Assistant Principal Humphrys pulled M.D. out of class to a room wherein she conducted a strip search

of M.D., outside of policy. Assistant Principal Humphrys demanded that M.D. lift her shirt and bra, exposing her breasts.

60.    Assistant Principal Humphrys did not tell M.D.'s parents about the search, nor did M.D.'s parents give consent to Assistant Principal Humphrys to search M.D.'s person.

61.    Assistant Principal Humphrys did not discover any contraband or any wrongful items on M.D.'s person nor her belongings.

62.    M.D. was humiliated and did not want to tell her parents about strip search.

63.    On the next day, October 1, 2024, Assistant Principal Humphrys and a male staff member conducted a second strip search of M.D., outside of policy. Assistant Principal Humphrys demanded that M.D. remove her shirt and bra, exposing her breasts while the male staff member watched. Eau Gallie High School has not been forthcoming as to the identification of the male staff member but under belief, it was Assistant Principal Robert Farrell who witnessed the second strip search.

64.    A true and correct copy of M.D.'s statement is attached hereto as **Exhibit D**.

65.    Like the first strip search, Assistant Principal Humphrys did not discover any contraband or any wrongful items on M.D.'s person nor her belongings. In addition, Assistant Principal Humphrys did not notify M.D.'s parents about the strip searches.

66. M.D. was traumatized and told her parents about the illegal strip searches. In turn, M.D.'s parents immediately emailed Superintendent Mark Rendell, stating that:

> We are livid!
>
> Our daughter was made to lift her shirt, pull out her bra and shake in front of a man in the room.
>
> The humiliation and indignity that the Eau Gallie Administration continues to heap upon our child is monstrous.
>
> The Daytons

67. A true and correct copy of the email sent to Superintendent Rendell is attached hereto as **Exhibit E**.

68. On October 2, 2024, M.D. began to show behavior of trauma and anxiety. M.D. re-entered therapy on the same day to discuss the incident.

69. On October 2, 2024, Superintendent Rendell met with Assistant Superintendent Rehmer, Principal Keith Barton, and Lena Wiebelt to discuss the strip searches, the hostile environment from the administration and staff that M.D. was experiencing and the effects it was having on her, the false molestation defamation, and the bullying of M.D. by students.

70. On October 16, 2024, the School Board met with Dayton about the illegal strip searches, false molestation reporting and the hostile environment that M.D. was experiencing. The School Board, specifically Assistant Superintendent

Rehmer and Principal Barton, promised to correct the hostile environment and separately promised to act according to Brevard policy.

71.    On October 17 and 18, 2024, Dayton contacted Eau Gallie High Administration and the School Board, respectively, due to the ongoing refusal to investigate the false DCF report.

72.    On October 21, 2024, the Daytons filed an Incident Report about the strip search.

73.    A true and correct copy of the Incident Report is attached hereto as **Exhibit F**.

74.    On the same date, October 21, 2024, Assistant Principal Humphrys conducted a third strip search of M.D., outside of policy, again.  Assistant Principal Humphrys was alone in the room, and M.D. was wearing a pink homecoming dress. Assistant Principal Humphrys searched M.D. and exposed her breasts.  Like the first and second strip searches, Assistant Principal Humphrys did not discover any contraband or any wrongful items on M.D.'s person nor her belongings.  In addition, Assistant Principal Humphrys did not notify M.D.'s parents about the strip search.

75.    On October 23, 2024, one of M.D's teachers marked a grammar assignment as incorrect even though it was correct, citing her "dislike" of the Daytons.

76.    On October 31, 2024, the School Board admitted fault, via email, regarding M.D.'s strip search:

Mr. Dayton,

I am following up regarding the incident reported on October 21, 2024. After investigating, I found that Eau Gallie High School staff did not follow district policy, specifically Policy 5771, Section D, which requires that a search of a student's person or intimate belongings be conducted by a staff member of the student's gender, in the presence of another staff member of the same gender, and only in exceptional circumstances when there is an immediate threat to the health or safety of the student or others.

To ensure proper procedure is followed in the future, I have taken the following steps:

1: Met individually with each member of the administrative team to review District Policy 5771, Section D.

2: Established protocols for situations when a staff member of the same gender as the student being searched is unavailable.

3: Conducted a group meeting with the administrative team to discuss and clarify this policy.

4: Reviewed multiple policies with the team and provided guidance on locating policies related to various incidents.

I sincerely apologize to you, [M.D.], and your family for the impact this oversight has caused.

Thank you,
Keith Barton, Principal

77.    A true and correct copy of the email sent to Principal Keith Barton is

attached hereto as **Exhibit G**.

78.    Despite the above commitment, the School Board continued to violate

policy, refused to conduct the required investigation into the strip searches according

to policy or upload the information to public record, and continued to ignore M.D.'s pleas to stop the ongoing hostile environment and harassment by students.

79.     By refusing to investigate the illegal strip searches, the School Board has exhausted any possible administrative remedies.

80.     On or about November 1, 2024, Dayton filed another complaint with the Florida Department of Education regarding the strip searches.

81.     On November 4, 2024, Dayton gave notice to the School Board stating that none of the October 16, 2024, assurances of M.D.'s hostile environment has been taken into effect, as M.D. continued to suffer a hostile environment with both students and staff.

82.     On the same day, November 4, 2024, Assistant Principal Humphrys conducted another search of M.D.  Predictably, Assistant Principal Humphrys did not find any contraband or any wrongful items on M.D.'s person.

83.     In November and December 2024, several one of M.D. teachers changed M.D.'s grades from 100 to zero.  Dayton had to prove, again, that M.D. did the work.

84.     On January 16, 2025, a student, (M.S.), made a false statement that M.D. physically sexually assaulted her in the cafeteria by reaching out and grabbing both of her breasts with both hands.

85.     Unknowingly to the student, however, the incident was recorded on video.  The video reveals that the student asks M.D. to help her to zip up her jacket

which has stuck.  Yet the student made a wild and fantastical story stating that M.D. made a sexual advance.  The video proved that M.S. lied.

86.     The school, specifically Assistant Principal Humphrys, knew that to be untrue based on the video evidence but decided to defame M.D. anyway.  Assistant Principal Humphrys allowed the student's parents to view the video but denied the Dayton's attempts.

87.     Instead, Assistant Principal Humphrys demanded that M.D. sign a "Stay Away" form to protect the (lying) student.  Then Assistant Principal Humphrys demanded that the Daytons to sign the form, which they declined.

88.     On January 24, 2025, the Daytons requested Assistant Principal Humphrys to recuse herself from the investigation due to the obvious conflicts of interest, given that she conducted several illegal strip searches of M.D.'s person.

89.     Assistant Principal Humphrys refused.  On the same day, Principal Barton allowed the Daytons to view the video, which proves M.D. did nothing more than to assist the student to zip up a jacket just as M.D. stated.

90.     If it was not for the video showing that M.D. was innocent, her life and future could have been ruined by the false accusation, just like the false reporting of molestation and pregnancy that the School Board refused to investigate.

91.     Assistant Principal Humphrys knew the accusation was false from the onset but still pursued M.D., making considerable effort to assassinate M.D.'s character, conceal information from the Daytons, conceal the video, and tried to get M.D. to sign "Stay Away" form.

92.     The student made her intentions to harm M.D. with this false accusation known to other students, and Assistant Principal Humphrys knew that the facts were inaccurate.

93.     On January 28, 2025, Principal Barton notified the Daytons that Assistant Principal Humphrys stopped the investigation regarding the incident in the school cafeteria, yet in February 2025, Assistant Principal Humphrys secretly continued to conduct the investigation against M.D.—the same investigation wherein the student was lying at the outset.

94.     In the meantime, on April 11, 2025, DCF Investigator Amarilis Vega and another unknown DCF personnel member came to Dayton's home to speak with M.D. regarding the molestation allegations.  Investigator Vega stated that she was investigating the DCF allegations and would like to speak with M.D.

95.     On April 15, 2025, Assistant Principal Maggie Fleming pulled M.D. from class to a school conference room wherein Investigator Vega and a detective were in the room.  The detective told M.D. that he was investigating the molestation accusation.  M.D. stated that she would not speak without Dayton, to which Assistant Principal Fleming, Investigator Vega, and the detective refused.  Instead, they continued to interrogate M.D. without any notice to the Daytons.   M.D. re-confirmed, again, that she had never been molested by Dayton or anyone.  After the meeting, M.D. called Dayton to pick her up as she was traumatized by Assistant Principal Fleming, Investigator Vega, and the detective.  M.D. then spoke with her therapist.

96.    M.D. is in therapy due to the above incidents and has suffered great emotional harm in the hands of the School Board and staff.

97.    From August 2023 until May 2025, the School Board stonewalled the Daytons and M.D. on their attempts to resolve the school complaints.  In the end, it is clear that the School Board and the school(s) never had M.D.'s best interests at heart.

98.    The School Board have a custom of violating their own policies, ignoring statutes, and allowing school officials to conduct illegal strip searches over a minor without any parental consent.

99.    Plaintiffs properly notified the State, pursuant to Fla. Stat. § 768.28, as to the state claims, to the Florida Department of Financial Services but it did not respond.

100.    All general and statutory conditions precedent to this action has either occurred or have been waived by operation of law.

101.    Alexander Hero Foundation, Inc., is entitled to recover reasonable fees in this action, pursuant to the Civil Rights Act, 42 U.S.C. § 1988.

<u>**COUNT I**</u>
**Violation of the Fourth Amendment – Unconstitutional Search and Seizure**
**Civil Rights Act, 42 U.S.C. § 1983, *et seq*.**
**Humphrys, *in her Individual Capacity***

102.    Plaintiffs re-allege the allegations set forth in paragraphs 5 through 101, above, as though fully alleged herein.

103.    Assistant Principal Humphrys is a "person" within the meaning of the Civil Rights Act.

104.    At all material times, she acted under color of state law, as an agent of the School Board, and within the scope of her employment and authority as a duly certified school official at the Eau Gallie High School.

105.    At all material times, Assistant Principal Humphrys directly participated in violating M.D.'s Fourth Amendment rights.

106.    Brevard School Board Policy 5771 outlines a specific procedure for searching a student's person or intimate belongings: the search must be conducted by a person of the student's gender, with another staff member of the same gender present, and should only be performed in exceptional circumstances where the health or safety of the student or others is immediately threatened.  This policy is designed to balance student privacy with the need for safety, requiring a high level of justification for invasive searches.

107.    A true and correct copy of Brevard School Board Policy 5771 is attached hereto as **Exhibit H**.

108.    Assistant Principal Humphrys did not have reasonable suspicion that M.D. had contraband nor wrongful items on her person on any of the illegal searches.

109.    At best, Assistant Principal Humphrys based the strip searches on unreliable hearsay from a student and proceeded to violate M.D.'s privacy and Fourth Amendment rights.

110.    Assistant Principal Humphrys did not have probable cause that M.D. had contraband nor wrongful items on her person.

111.    Assistant Principal Humphrys did not secure a Warrant to search M.D.'s person.

112.    Assistant Principal Humphrys did not secure a Warrant to search M.D.'s belongings.

113.    As to each strip search, there were no exceptional circumstances where the health or safety of any student or others were immediately threatened.

114.    Assistant Principal Humphrys violated Brevard School Board Policy 5771.

115.    Assistant Principal Humphrys acted recklessly or intentionally and had no articulable facts supporting the searches.

116.    Any reasonable school official would have known searching or seizing a minor without reasonable suspicion or probable cause constitutes a violation of the Fourth Amendment and Brevard School Board Policy 5771.

117.    This search and seizure of an innocent person—without probable cause, without a contemporaneous execution of a valid search, and without exigent circumstances—is a clear Fourth Amendment violation far outside any narrow exception permitted by any Supreme Court precedent.

118.    M.D. had both a subjective and objective expectation of privacy.  She exhibited a subjective expectation of privacy by not consenting to Assistant Principal Humphrys search.  As to the objective expectation of privacy, society is prepared to

recognize reasonable suspicion or probable cause, but society will not tolerate a pre-textual basis, like here, wherein a school official bases her finding on unreliable hearsay from a minor student.

119.    Qualified immunity is unavailable to Assistant Principal Humphrys because she conducted an unreasonable search and seizure in violation of M.D.'s Fourth Amendment rights that were clearly established at the time of the challenged action, bound by the United States Supreme Court from *Safford Unified School District v. Redding*, 557 U.S. (2009) and its progeny.

120.    Strip searches lacking a legitimate legal basis, such as suspicion of a crime or safety risk, are unconstitutional.

121.    As a direct and proximate result of the acts and omissions described herein, M.D. suffered humiliation, emotional distress, and general damage that resulted from being illegally stopped, searched, seized, and detained without justification, in an amount to be determined by the jury.

122.    Punitive damages are available against Assistant Principal Humphrys and are hereby claimed because she was reckless or had callous indifference of M.D.'s constitutional rights.

**WHEREFORE,** Plaintiffs, NICHOLAS DAYTON and M.D., demands judgment against Defendant, CARRIE HUMPHRYS, and respectfully requests the entry of an Order awarding M.D. with (i) nominal, compensatory, special damages, and punitive damages; (ii) reasonable attorneys' fees; (iii) costs of the action; (iv)

prejudgment interest; and (v) any such other, further, and different relief as the Court deems appropriate.

### COUNT II
**Violation of the Fourteenth Amendment – *Monell* Liability**
**Civil Rights Act, 42 U.S.C. § 1983, *et seq.***
**The School Board**

123.    Plaintiffs re-allege the allegations set forth in paragraphs 5 through 101, above, as though fully alleged herein.

124.    The School Board is a municipal entity acting under color of state law and is a "person" within the meaning of the Civil Rights Act.

125.    Superintendent Rendell is the final policymaker for the School Board with regard to establishing policies, customs, and training programs governing the School Board on behalf of Brevard Public Schools.

126.    At all relevant times, the School Board maintained official policies, including Policy 5771, that governed student searches and required school personnel to protect students from unreasonable searches in accordance with the Fourth Amendment.

127.    Policy 5771 prohibits strip searches of students under nearly all circumstances and imposes strict limitations and procedural safeguards, including requiring administrative oversight and parental notification.

128.    Despite this policy, school administrators and staff under the School Board's supervision conducted an illegal strip search of M.D., a minor student, without legal justification, probable cause, or exigent circumstances.

129.    This unlawful search was conducted with full knowledge of the existence and content of Policy 5771 but in flagrant violation of it.

130.    On information and belief, the School Board failed to adequately train school personnel on the constitutional limitations of student searches, including but not limited to:

- the scope and limits of Policy 5771,

- the constitutional prohibition on unreasonable and invasive searches, and

- the necessity of respecting student privacy and bodily integrity.

131.    The School Board's failure to train was not an isolated oversight but reflects a pattern of deliberate indifference to the rights of students where incidents where staff or administrators disregard many policies without consequence, including but not limited to the School Board's refusal to investigate repeated similar incidents:

- In August 2024, Avanese Taylor filed suit against the School Board after her minor son was bullied by other students, but the School Board failed to investigate the incident and failed to enforce school policies,

- In March 2024, the parents of John and Tina Conover filed suit against the School Board based on the lack of action to protect their child from constant bullying and failing to investigate,

- In June 2023, Jennifer Jenkins filed suit against the School Board for withholding public records and enforcing school policies.

132.   Further, the School Board failed to properly supervise (i.e. Assistant Superintendent Rehmer and Principal Barton) and discipline school administrators who violated Policy 5771 and did not implement mechanisms to enforce compliance with constitutional standards.

133.   The School Board's deliberate indifference to its own policy, combined with its failure to train and supervise, directly caused the constitutional injury suffered by Plaintiffs, namely:

- violation of bodily integrity,

- emotional and psychological trauma, and

- deprivation of rights secured by the Fourth and Fourteenth Amendments.

134.   The School Board's failure to enforce its own policy rises to the level of a *de facto* policy or custom of tolerating constitutional violations in the implementation of student search procedures.

135.   As a direct and proximate result of the School Board's unconstitutional policies, practices, or customs, Plaintiffs suffered harm entitling them to compensatory damages, emotional distress, and general damage, in an amount to be determined by the jury.

**WHEREFORE,** Plaintiffs, NICHOLAS DAYTON and M.D., demands judgment against Defendant, the SCHOOL BOARD OF BREVARD COUNTY,

FLORIDA, and respectfully requests the entry of an Order awarding Dayton and M.D. with (i) nominal, compensatory, and any special damages; (ii) reasonable attorneys' fees; (iii) costs of the action; (iv) prejudgment interest; and (v) any such other, further, and different relief as the Court deems appropriate.

**COUNT III**
**Violation of the Fourteenth Amendment – Stigma Plus**
**Civil Rights Act, 42 U.S.C. § 1983,** *et seq.* **and** *Paul v. Davis*
**John Doe 1-10,** *in their Individual Capacities*

136.    Dayton re-alleges the allegations set forth in paragraphs 5 through 101, above, as though fully alleged herein.

137.    Doe 1-10 are "persons" within the meaning of the Civil Rights Act.

138.    At all material times, Doe 1-10 acted under color of state law, as agents of the School Board, and within the scope of their employment and authority as duly certified school officials at the Eau Gallie High School.

139.    At all material times, Doe 1-10 directly participated in violating Dayton's Fourteenth Amendment rights.

140.    Doe 1-10 made public, false, and stigmatizing statements regarding the allegation that M.D. was molested and became pregnant by Dayton.

141.    Doe 1-10 damaged Dayton's reputation, honesty, integrity, or morality sufficiently serious to damage his standing in the community.

142.    The public reasonably understood that those defamatory statements were about Dayton.

143.    Doe 1-10 knew or should have known that the statements, which were defamatory and false.

144.    The defamatory statements were reasonably understood to mean that Dayton had committed a crime, even though Doe 1-10 possessed no evidence that Dayton committed a crime.

145.    As a result of Doe 1-10 actions' regarding the molestation and pregnancy allegation, DCF has halted/stopped the process of Dayton to adopt another child.  The Daytons had family plans to adopt another child or two before Doe 1-10 published the defamatory statements.

146.    Doe 1-10 stigmatizing actions and accompanying tangible harm occurred without adequate procedural protections, such as notice and a hearing.

147.    By refusing the investigate the molestation and pregnancy allegation, the School Board violated Dayton's procedural due process rights without a chance to clear his name.

148.    Doe 1-10's defamatory statements were a substantial factor in causing Dayton personal and professional harm, associated deprivations of his constitutional and statutory rights.

149.    Dayton demanded the School Board to correct the false allegations but the School Board and Doe 1-10 refused.

150.    Doe 1-10 acted with malice, oppression, and fraud.  Among other things, Doe 1-10 knew or should have known that the statements about Dayton were

false and made them anyway in complete indifference to Dayton's rights and at a time when Dayton was most vulnerable.

151.    Dayton has a liberty interest secured by the United States Constitution and the Florida Constitution to his good name and reputations, which was taken from him without due process of law and in conjunction with other violations and deprivations of Dayton's constitutional rights.

152.    Dayton's injury to his reputation caused the denial of a federal protected right or was inflicted in connection with the deprivation of a federal protected right.

153.    Qualified immunity is unavailable to Doe 1-10 because they defamed Dayton with malice in violation of Dayton's constitutional rights that were clearly established at the time of the challenged action, bound by the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court.

154.    As a direct and proximate result of the acts and omissions described herein, Dayton suffered humiliation, emotional distress, and general damage without justification, in an amount to be determined by the jury.

155.    Punitive damages are available against Doe 1-10 and are hereby claimed because they were reckless or had callous indifference to the rights of Dayton.

**WHEREFORE,** Plaintiff, NICHOLAS DAYTON, demands judgment against Defendant, JOHN DOE 1-10, and respectfully requests the entry of an Order awarding Dayton with (i) nominal, compensatory, special, and punitive damages; (ii)

reasonable attorneys' fees; (iii) costs of the action; (iv) prejudgment interest; and (v) any such other, further, and different relief as the Court deems appropriate.

**COUNT IV**
**Defamation**
**John Doe 1-10,** *in their Individual Capacities*

156.    Dayton re-alleges the allegations set forth in paragraphs 5 through 101, paragraphs 135 through 140, and paragraphs 143 through 144, above, as though fully alleged herein.

157.    Doe 1-10 are employees of the School Board.

158.    The School Board is vicariously liable for the conduct of its employees.

159.    Doe 1-10 acted with malice, oppression, fraud, bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights.  Among other things, Doe 1-10 knew that they did not have any legal basis to allege that Dayton molested M.D. and that M.D. became pregnant by Dayton but they proceeded to do that anyway in complete indifference to Dayton's rights and at a time when he was most vulnerable.

160.    As a direct and proximate result of the acts and omissions described herein, Dayton suffered humiliation, emotional distress, and general damage without justification, in an amount to be determined by the jury.

161.    Punitive damages are available against Doe 1-10 and are hereby claimed because they were reckless or had callous indifference to the rights of Dayton.

WHEREFORE, Plaintiff, NICHOLAS DAYTON, demands judgment against Defendant, JOHN DOE 1-10, and respectfully requests the entry of an Order awarding Dayton with (i) nominal, compensatory, special, and punitive damages; (ii) reasonable attorneys' fees; (iii) costs of the action; (iv) prejudgment interest; and (v) any such other, further, and different relief as the Court deems appropriate.

### COUNT V
**Negligent Supervision**
**The School Board**

162.    Plaintiffs re-allege the allegations set forth in paragraphs 5 through 101, above, as though fully alleged herein.

163.    Assistant Superintendent Rehmer and Principal Barton are employees of the School Board.

164.    The School Board is vicariously liable for the conduct of its employees.

165.    The School Board owes students, including M.D., a duty of care akin to a reasonable guardian or custodian while students are in their custody to avoid causing injury/trauma.

166.    As to at least October 2, 2024, Assistant Superintendent Rehmer and Principal Barton were aware of two illegal strip searches from Assistant Principal Humphrys; however, they failed to intervene, stop, or report it, allowing Assistant Principal Humphrys to continue to illegal strip search M.D.'s person on or October 21, 2024.

167.    As a result, the School Board failed to properly supervise Assistant Superintendent Rehmer and Principal Barton.

168.   Assistant Superintendent Rehmer and Principal Barton were aware of the policy violation of Brevard School Board Policy 5771 regarding Assistant Principal Humphrys.

169.   But for the School Board's inactions regarding Assistant Superintendent Rehmer and Principal Barton to stop the illegal strip searches of M.D. from Assistant Principal Humphrys, M.D. would not have suffered emotional distress, humiliation, or other harm.

170.   Due to their roles for the School Board, Assistant Superintendent Rehmer and Principal Barton had a realistic opportunity to intervene, and their harm was foreseeable given that Policy 5771 explicitly bans such searches.

171.   As a direct and proximate result of the acts and omissions described herein, Plaintiffs suffered humiliation, emotional distress, psychological trauma, ongoing mental health effects, and general damage without justification, in an amount to be determined by the jury.

**WHEREFORE,** Plaintiffs, NICHOLAS DAYTON and M.D., demands judgment against Defendant, the SCHOOL BOARD OF BREVARD COUNTY, FLORIDA, and respectfully requests the entry of an Order awarding Dayton and M.D. with (i) nominal, compensatory, and any special damages; (ii) reasonable attorneys' fees; (iii) costs of the action; (iv) prejudgment interest; and (v) any such other, further, and different relief as the Court deems appropriate.

## COUNT VI
### Intentional Infliction of Emotional Distress
### Humphrys, *in her Individual Capacity*

172.    Plaintiffs re-allege the allegations set forth in paragraphs 5 through 101, above, as though fully alleged herein.

173.    Assistant Principal Humphrys is an employee of the School Board.

174.    The School Board is vicariously liable for the conduct of its employees.

175.    Assistant Principal Humphrys's strip search conduct was intentional or reckless.

176.    Assistant Principal Humphrys's strip search conduct was extreme, outrageous, and despicable when she demanded M.D., a minor, to lift her shirt, pull out her bra and shake in front of a man in the room, knowing that M.D. did not have any contraband nor any wrongful items on her person.

177.    In so doing, Assistant Principal Humphrys abused her position of authority as a school official of coercion or threats, which provided her with real power over M.D.'s interests, especially because Assistant Principal Humphrys did not notify M.D.'s parents.

178.    Assistant Principal Humphrys knew the existence of Brevard School Board Policy 5771 before she searched M.D., multiple times.

179.    Assistant Principal Humphrys knew that she had zero reasonable suspicion to stop, seize, and strip search M.D. given that there were no exceptional circumstances where the health or safety of any student or others were immediately threatened.

180.    Assistant Principal Humphrys knew that her conduct would likely result in M.D.'s mental and emotional distress based on her false assertions of alleged contraband or wrongful items on M.D.'s person, which led to M.D.'s public exposure or humiliation.

181.    Assistant Principal Humphrys acted with the intent to cause M.D. emotional distress, or acted with reckless disregard of the probability that M.D. would suffer emotional distress, knowing that her conduct was directed at and would be received by M.D.

182.    Assistant Principal Humphrys's conduct was a substantial factor in causing M.D. severe emotional distress to the point that M.D. needed therapy, which is well-documented.

183.    In so doing, Assistant Principal Humphrys acted with malice and oppression against M.D.

184.    As a direct and proximate result of the acts and omissions described herein, M.D. suffered humiliation, emotional distress, and general damage without justification, in an amount to be determined by the jury.

185.    Punitive damages are available against Assistant Principal Humphrys and are hereby claimed because she was reckless or had callous indifference of M.D.'s constitutional rights.

**WHEREFORE,** Plaintiffs, NICHOLAS DAYTON and M.D., demands judgment against Defendant, CARRIE HUMPHRYS, and respectfully requests the entry of an Order awarding M.D. with (i) nominal, compensatory, special damages,

and punitive damages; (ii) reasonable attorneys' fees; (iii) costs of the action; (iv)

prejudgment interest; and (v) any such other, further, and different relief as the Court

deems appropriate.

**DATED:** November 14, 2025

Respectfully submitted,

*Coleman Watson*

**Coleman W. Watson, Esq.**
Florida Bar. No. 0087288
California Bar No. 266015
Georgia Bar No. 317133
New York Bar No. 4850004
Email: coleman@alexanderhero.com

**ALEXANDER HERO**
20 North Orange Avenue, 11th Floor
Orlando, FL 32801
Tel: (407) 543-0111

*Attorneys for Plaintiffs*

## <u>VERIFICATION</u>

STATE OF FLORIDA
COUNTY OF ORANGE


     I, the undersigned, NICHOLAS DAYTON, is a Florida citizen and one of the

Plaintiffs in this civil action.  As such, I have personal knowledge of the facts set

forth in the Verified Complaint.  I have reviewed the allegations of facts set forth in

the Verified Complaint under penalty of perjury under the laws of the United States

of America and the State of Florida and hereby verify that said facts are true, correct,

and accurate to the best of my knowledge.


Dated this 14th day of November 2025.


                    *Nicholas Dayton*
                    NICHOLAS DAYTON